## LEAHY v. INDIAN TERRITORY ILLUMINATING OIL CO.

No. 2718. Opinion Filed September 23, 1913.

(135 Pac. 416.)

1. **APPEAL AND ERROR—Ruling on Demurrer.** On appeal by a plaintiff from an order which sustained a demurrer to the petition on one of several grounds, this court will consider all the grounds assigned, and the order will be sustained if any of such grounds are well taken.

2. **INDIANS—Osage Allotments—Oil and Gas Royalties.** The plenary power of Congress over the tribal relations and lands of the Osage Tribe of Indians in Oklahoma could not be so limited by any of the provisions of Act March 3, 1905, c. 1479, 33 St. at L. 1048, 1061, extending in part, for an additional term, a certain oil and gas lease, made March 16, 1896, by the Osage Nation of Indians to Edwin B. Foster, and approved by the Secretary of the Interior, and owned by the defendant in error under assignments, also approved by the Secretary of the Interior, as to preclude Congress, by the enactment of June 28, 1906 (34 St. at L. 539, c. 3572), from providing how and to whom the oil and gas royalties on allotted lands should be paid.

3. **SAME.** Neither was Congress, in the exercise of its plenary power, precluded by the terms of the said Foster lease, providing that, if subsequent thereto any of the leased tribal lands were allotted, then the royalties accruing therefrom should be paid to the respective allottees instead of to the treasurer of the Osage Nation, from afterwards providing that royalties from allotted lands should be paid into the United States Treasury to the credit of the Osage Nation.

4. **SAME.** Nothing in Act March 3, 1905, c. 1479, 33 St. at L. 1048, 1061, or in the original Foster lease gave to the individual members of the Osage Tribe, who were subsequently allotted lands under Act June 28, 1906, c. 3572, 34 St. at L. 539, within that part of the

Osage Nation covered by said extended lease, any individual right to the royalties on oil and gas wells located on their respective allotments.

5.      **SAME—Oil and Gas—Ownership.** By the seventh paragraph of section 2 of Act June 28, 1906, c. 3572, 34 St. at L. 539, known generally as the Osage Allotment Act, it is expressly provided that the oil, gas, coal, or other minerals on allotted lands should be reserved to the use of the tribe for a period of 25 years, at the expiration of which time, unless otherwise provided by act of Congress, the same should become the property of the individual owner.

6.      **SAME.** By the second paragraph of section 4 of said Allotment Act of June 28, 1906, c. 3572, 34 St. at L. 544, it is further expressly provided that the royalty received from oil, gas, coal, and other mineral leases upon allotted lands should be placed in the United States Treasury to the credit of the members of the Osage Tribe of Indians as other moneys of the tribe and should be distributed to the individual _members of said Osage Tribe according to the roll provided for therein as and when payments of interest on tribal trust funds are made.

7.      **SAME — Oil and Gas — Leasing.** Section 3 of said Allotment Act of June 28, 1906, c. 3572, 34 St. at L. 543, further expressly reserves to the Osage Tribe, for a period of 25 years from April 8, 1906, the oil, gas, coal, or other minerals covered by the lands for the selection and division of which provision was made and authorizes the tribal council to lease allotted lands for oil, gas, and other minerals, with the approval of the Secretary of the Interior, but that nothing therein contained should affect any valid existing lease or contract.

8.      **SAME.** By the latter proviso to the foregoing section of the allotment act, it was intended not to give to the individual allottee the royalties arising from oil and gas wells on his or her allotment, as mentioned in Act March 3, 1905, c. 1479, 33 St. at L. 1048, 1061, and in the Foster lease, but to expressly recognize the rights of the holders of any valid lease or contract, and which rights were to remain in full force and unimpaired by the passage of the act or the allotment of the tribal lands.

9.      **SAME—Construction of Allotment Deed—Oil and Gas.** The allotment deed, issued to plaintiff by express provision, reserves to the Osage Tribe of Indians, for a period of 25 years from and after April 8, 1906, all oil, gas, coal, and other minerals covered by the lands allotted to her.

10.     **STATUTES—Construction.** When the words used in a statute convey a definite meaning, which involves no absurdity nor any contradiction of other parts of the act, then that meaning, apparent on the face of the statute, must be accepted.

(Syllabus by Sharp, C.)

*Error from District Court, Osage County;*
*R. H. Hudson, Judge.*

Action by Martha Leahy against the Indian Territory Illuminating Oil Company to recover oil and gas royalties. Judgment for defendant, and plaintiff brings error. Affirmed.

*Boone, Leahy & MacDonald,* for plaintiff in error.

*John H. Brennan,* for defendant in error.

*Kappler & Merillat* and *P. A. Shinn, amici curiae.*

Opinion by SHARP, C. Acting under authority of an act of Congress of February 28, 1891 (26 St. at L. 795), on March 16, 1896, the Osage Nation of Indians leased to Edwin B. Foster the lands of the Osage Nation, comprising about 1,500,000 acres, in what was then the territory of Oklahoma, for oil and gas purposes for a period of ten years. This lease was duly executed on the part of the tribal authorities and approved by the Secretary of the Interior on April 8, 1896. Subsequent thereto the Indian Territory Illuminating Oil Company, under proper assignments, duly approved by the Secretary of the Interior, acquired the title to the said Foster lease, and on March 3, 1905, a provision extending said lease in part was incorporated in the Indian Appropriation Act (33 St. at L. 1048, 1061), which provision is as follows:

"Provided, that any allotments which may be made of the Osage reservation in Oklahoma Territory shall be made subject to the terms and conditions of the lease herein authorized, the same being a renewal as to a part of the premises covered by a certain lease dated March sixteenth, eighteen hundred and ninety-six, given by the Osage Nation of Indians to Edwin B. Foster and approved by the Secretary of the Interior and now owned by the Indian Territory Illuminating Oil Company under assignments approved by the Secretary of the Interior, which said lease and all subleases thereof duly executed on or before December thirty-first, nineteen hundred and four, or executed after that date based upon contracts made prior thereto, and which have been or shall be approved by the Secretary of the Interior, to the extent of six hundred and eighty thousand acres in the aggregate, are hereby extended for the period of ten years from the sixteenth day of March, nineteen hundred and six, with all the conditions of said original lease except that from and after the sixteenth day of March, nineteen hundred and six, the royalty

to be paid on gas shall be one hundred dollars per annum on each gas well, instead of fifty dollars as now provided in said lease, and except that the President of the United States shall determine the amount of royalty to be paid for oil. Said determination shall be evidenced by filing with the Secretary of the Interior on or before December thirty-first, nineteen hundred and five, such determination; and the Secretary of the Interior shall immediately mail to the Indian Territory Illuminating Oil Company and each sublessee a copy thereof."

By this act the terms of the original lease were changed in the following particulars: (1) The new lease was limited in extent to 680,000 acres in the aggregate; (2) royalty on each gas well was raised from $50 to $100; (3) the royalty on oil was left open, the amount to be determined by the President of the United States.

According to the allegations of plaintiff's amended petition, the lease thus extended, among other provisions, contained the following:

"And it is agreed and understood between the parties hereto that the privilege of conducting mining operations hereunder is permitted and agreed to, upon the express condition that if the Indian title to any portion of land used and occupied by the lessee, his heirs or assigns, shall be extinguished before the expiration of the time herein stated, then and in that event, this lease shall be void, and of no effect with reference to the lands to which the title shall be extinguished, from and after the date of such extinguishment; and the lessee shall be subject to removal therefrom upon sixty days' notice from the Secretary of the Interior, in his discretion; provided, that the extinguishment of the title herein mentioned shall not apply to the lands which shall be allotted in severalty to the Indians, so as to affect this lease to the lands so allotted, but in case any such lands are so allotted, then the royalties accruing on the same shall be paid to the allottees, respectively, instead of to the National Treasurer of the Osage Nation."

Thereafter, and on June 28, 1906, Congress passed an act providing for the allotment in severalty of the lands of the Osage Indians (34 St. at L. 539), and in the carrying out of the provisions of said allotment act there was allotted to plaintiff as her surplus allotment 320 acres of land in sections 23 and 24,

township 24 north, range 11 east, of the Indian Meridian. These allotted lands were included within the territorial limits of the renewed lease of 680,000 acres.

Plaintiff has attached to her petition, as an exhibit thereto, a copy of her allotment deed or patent to both her surplus and homestead lands, in which, in the *habendum* clause, is the following limitation upon her title:

"To have and to hold the same unto the said Martha Leahy, her heirs, executors, administrators and assigns forever; subject to all the conditions and limitations and provisions of said act of Congress (Act of June 28, 1906, 34 St. at L. 539), one of which is that the oil, gas, coal and other minerals covered by the land for the selection and division of which provision is herein made, are hereby reserved to the Osage Tribe for a period of twenty-five years from and after the 8th day of April, 1906."

Plaintiff claims the right, as the owner of said allotment, to receive and collect from the defendant direct all oil and gas royalties on account of producing oil and gas wells on her said surplus allotment, basing her claim on the terms of the original Foster lease and the act of Congress extending the same, and of section 3 of the allotment act of June 28, 1906. To the plaintiff's amended petition, the defendant demurred on the following grounds: (1) That the court was without jurisdiction of the subject-matter of the action; (2) defect of parties; (3) that the amended petition did not state facts sufficient to constitute a cause of action. The demurrer was sustained on the ground that the court was without jurisdiction of the subject-matter.

Without determining the question of jurisdiction, we may say at the outset that we deem the petition insufficient. In passing upon the objections urged below, we are not confined to the reasons given by the court for sustaining the demurrer and dismissing the plaintiff's cause of action or to the particular ground of the demurrer decided, but will consider all of the grounds assigned and sustain the order, if any of such grounds are well taken. *Hodgins v. Hodgins,* 23 Okla. 625, 103 Pac. 711; *Hancock v. Youree,* 25 Okla. 460, 106 Pac. 841; *Sechrist v. Rialto Irr. Dist. et al.,* 129 Cal. 640, 62 Pac. 261; *Hartford Fire Ins. Co. v. Hollis,* 58 Fla. 268, 50 South. 985; *Peterman v. Pope,*

74 S. C. 296, 54 S. E. 569; *Porter v. Plymouth Gold Min. Co.,* 29 Mont. 347, 74 Pac. 938, 101 Am. St. Rep. 569.

The question of the jurisdiction of the district court of Osage county, in cases such as the one presented, presents a question of great importance and one not necessary to be here determined. Whatever rights plaintiff may have on account of her allotment inure to her and are controlled and limited by the terms of the Act of June 28, 1906, and not by any previous acts of Congress authorizing or extending tribal leases or by the provisions of such leases. Prior to the selection of allotments by or on behalf of the members of the Osage Tribe of Indians, no member of that tribe had, or could have acquired, the title to any particular tract of land in the Osage Nation other than in town sites. At its pleasure it was within the power of the general government to determine upon and execute its own plan for the division of these lands among the members of the tribe. While it is true that the title to the lands of Indians may be vested in the tribes or their members either by law or treaty, such title does not vest in the individual members of such tribe without the sanction of the government, and certainly not in a manner contrary to restrictions declared by Congress. *United States v. Aaron et al.* (C. C.) 183 Fed. 347.

The arbitrary power possessed by Congress in dealing with the tribal relations of the Indians is very generally, if not uniformly, recognized. Speaking with reference to the right of Congress in this regard, it was said by Mr. Justice White in *Lone Wolf v. Hitchcock,* 187 U. S. 553, 23 Sup. Ct. 216, 47 L. Ed. 299:

"Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government. Until the year 1871 the policy was pursued of dealing with the Indian tribes by means of treaties, and of course a moral obligation rested upon Congress to act in good faith in performing the stipulations entered into on its behalf. * * * The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances

arise which will not only justify the government in disregarding the stipulations of the treaty but may demand, in the interest of the country and the Indians themselves, that it should do so. When, therefore, treaties were entered into between the United States and a tribe of Indians, it was never doubted that the power to abrogate existed in Congress, and that in a contingency such power might be availed of from considerations of governmental policy, particularly if consistent with perfect good faith towards the Indians. In *United States v. Kagama* (1885) 118 U. S. 375, 382, 6 Sup. Ct. 1109, 1113, 30 L. Ed. 228, 230, speaking of the Indians, the court said: 'After an experience of a hundred years of the treaty-making system of government, Congress has determined upon a new departure—to govern them by acts of Congress. This is seen in the Act of March 3, 1871, embodied in section 2079 of the Revised Statutes: "No Indian nation or tribe, within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power, with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3d, 1871, shall be hereby invalidated or impaired." ' "

That Indians, such as the Osages, who had not been fully emancipated from the control and protection of the United States, are subject, at least so far as the tribal lands were concerned, to be controlled by direct legislation of Congress is also declared in *Choctaw Nation v. United States,* 119 U. S. 1, 27, 7 Sup. Ct. 75, 30 L. Ed. 306, 314; *Stephens v. Cherokee Nation,* 174 U. S. 445, 483, 19 Sup. Ct. 722, 43 L. Ed. 1041, 1054. See, also, *Cherokee Nation v. Hitchcock,* 187 U. S. 294, 307, 23 Sup. Ct. 115, 47 L. Ed. 183; *United States v. Rickert,* 188 U. S. 432, 23 Sup. Ct. 478, 47 L. Ed. 532; *Wallace v. Adams,* 204 U. S. 415, 27 Sup. Ct. 363, 51 L. Ed. 547; *Tiger v. Western Investment Co.,* 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738; *Heckman v. United States,* 224 U. S. 413, 32 Sup. Ct. 424, 56 L. Ed. 820; *Ligon v. Johnston,* 164 Fed. 670, 90 C. C. A. 486; *Hayes v. Barringer,* 168 Fed. 221, 93 C. C. A. 507; *United States v. Allen et al.,* 103 C. C. A. 4, 179 Fed. 13; *Texas Co. v. Henry,* 34 Okla. 342, 126 Pac. 224.

No vested rights were acquired by the plaintiff in error either under prior legislation or any act done under authority thereof.

She was not and could not have been a party to the Foster lease, and the fact that said lease may have provided, in the event the demised land should be allotted in severalty, the royalties accruing thereon should be paid to the respective allottees instead of the National Treasurer of the Osage Nation is without force as against the specific provisions to the contrary contained in the subsequent allotment act.

It is further contended, however, that by the terms of section 3 of the allotment act, providing that nothing therein contained shall be construed as affecting any valid existing lease or contract, provision for payment of the royalty direct to the allottee is expressly made. Obviously such was not the legislative intent, as appears from different provisions of said act.

The seventh paragraph of section 2, among other provisions, contains the following:

"And provided further, that nothing herein shall authorize the sale of the oil, gas, coal, or other minerals covered by said lands, said minerals being reserved to the use of the tribe for a period of twenty-five years, and the royalty to be paid to said tribe as hereinafter provided: And provided further, that the oil, gas, coal, and other minerals upon said allotted lands shall become the property of the individual owner of said land at the expiration of said twenty-five years, unless otherwise provided for by act of Congress."

It would be difficult to employ language having a clearer or more explicit meaning. In the connection used it means that even though a certificate of competency be issued and the surplus lands thereby permitted to be sold, and though taxable, yet a sale may not be made of the oil, gas, coal, or other minerals covered by said land for a period of 25 years, at which time the ownership of the allottee becomes complete, unless otherwise provided by act of Congress. By section 5 a further provision for the termination of the trust is found. By the second paragraph of section 4 it is expressly provided that the royalty received from oil, gas, coal, and other mineral leases, upon the land for which selection and division are therein provided, and the moneys received from the sale of town lots, together with the buildings thereon, and all moneys received from the sale of the three reser-

vations of 160 acres each, in said act reserved for dwelling purposes, and all moneys received for grazing lands shall be placed in the Treasury of the United States to the credit of the members of the Osage Tribe of Indians as other moneys of said tribe are to be deposited, under the provisions of said act, and the same shall be distributed to the individual members of said tribe according to the roll provided for therein in the manner and at the same time that payments are made of interest or other moneys held in trust for the Osages by the United States, except as therein provided. It is further provided, in the third paragraph of section 4, that there shall be set aside from the royalties received from oil and gas not to exceed $50,000 a year for ten years from the 1st day of January, 1907, for the support of the schools in the Indian reservation. By the fourth paragraph of section 4 it is further provided that there shall be set aside from the royalties received from oil, gas, coal, and other mineral leases, and moneys received from the sale of town lots, and rents from grazing lands, not to exceed $30,000 for agency purposes and an emergency fund for the Osage Tribe. By the sixth paragraph of section 2 it is provided that the surveys, salary of allotting commission, and all other expenses necessary in making the selection and division of land therein provided for shall be paid by the Secretary of the Interior out of any Osage funds derived from the sale of town lots, royalties from oil, gas, or other minerals, or rents from grazing lands.

These several provisions leave no room for a doubt that all oil and gas royalties on allotted lands, for the term therein provided, should be placed in the United States Treasury to the credit of the members' of the Osage Tribe of Indians and distributed in equal parts to the duly enrolled members of said tribe. Nor is there anything to be found in section 3 to the contrary. In fact, said section provides that the oil, gas, coal, or other minerals underlying the allotted lands are reserved to the tribe for a period of 25 years from and after the 8th day of April, 1906. The section provides that leases for all oil, gas, and other minerals, covered by selection and division of lands

therein provided for, may be made by the Osage Tribe of Indians, through its tribal council, and with the approval of the Secretary of the Interior, and under such rules and regulations as he may prescribe; the royalties to be paid to the tribe on account thereof to be determined by the President of the United States. The proviso concluding this section, upon which so much stress has been placed by plaintiff, simply means that nothing done in pursuance of the provisions in said section shall in any wise affect any valid existing law or contract, and the sole purpose of which was to protect the holders of valid leases or contracts, and which were to remain in full force and unimpaired by anything done or authorized by the passage of said act. Under this provision, authority for leasing something over 800,000 acres of unleased Osage land was provided for.

Nor does the latter portion of the twelfth paragraph of section 2 of the allotment act, continuing in full force and effect the provisions of the previous act of March 3, 1905, relating to the Osage reservation, in any wise affect those provisions of the former act, to which attention has been called, and which concerns the title to the oil and gas found underneath allotted lands or to whom the royalty thereon shall be paid. It is provided by section 2 of said act that the lands of the Osage Tribe of Indians shall be divided among the members of said tribe and each given his or her fair share thereof as therein provided. Manifestly it was the purpose of the act to make, as nearly as possible, an equal distribution of the common tribal property. *De Graffenreid v. Iowa Land & Trust Co.,* 20 Okla. 687, 95 Pac. 624. This could not be done without reserving to the tribe the oil and gas underneath both the allotted and unallotted lands. Land of comparatively small agricultural value may have, and often has, oil and gas deposits of great value, while other lands are barren of oil and gas deposits. Congress was careful, in the act authorizing allotment in severalty, to protect the allottee against his own improvidences, not only by restrictions upon alienation, but by providing that the general government, through its instrumentalities, should collect and disburse at stated times all oil and gas royalties. It is not claimed that the defendant

company has not paid to the tribal authorities all royalties due by it; it being contended only that payments of royalties on plaintiff's allotment have not been made directly to her, to the exclusion of all other members of the tribe. The provisions of the allotment act, as already indicated, are so clear in their meaning that no great difficulty in construing the statute is presented.

We must therefore give to the words employed in the act the meaning apparent upon their face. As was said by this court in *Neilson v. Alberty*, 36 Okla. 490, 129 Pac. 847, in quoting from *Board of Lake County Com'rs v. Rollins*, 130 U. S. 670, 9 Sup. Ct. 652, 32 L. Ed. 1061:

"To get at the thought or meaning expressed in a statute, a contract, or a constitution, the first resort, in all cases, is to the natural signification of the words, in the order of grammatical arrangement in which the framers of the instrument have placed them. If the words convey a definite meaning which involves no absurdity, * * * then that meaning, apparent on the face of the instrument, must be accepted, and neither the courts nor the Legislature have the right to add to it or take from it."

The deed issued to plaintiff for her allotment on April 17, 1909, particularly mentions that the title to the land is taken by her subject to all the conditions, limitations, and provisions of the act of Congress authorizing the allotment of lands and specifically provides that one of said conditions is that the oil, gas, coal, and other minerals covered by the land allotted are reserved to the Osage Tribe for a period of 25 years from and after the 8th day of April, 1906. This deed, signed by the principal chief of the Osages, approved by the Secretary of the Interior, was accepted by plaintiff and upon its face shows a limitation upon plaintiff's title to her allotted lands.

From what has been said, it appears that plaintiff's petition not only failed to state a cause of action but that no right of action, over the subject-matter of the controversy, was vested in her.

The judgment of the trial court, sustaining defendant's demurrer and dismissing plaintiff's amended petition, should be affirmed.

By the Court: It is so ordered.